IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY

| | |
|---|---|
| CARLA C. INGRAHAM<br>7605 Mohawk Drive<br>Prairie Village, Kansas 66208<br><br>        Plaintiff,<br><br>        v.<br><br>UBS FINANCIAL SERVICES, INC.<br>d.b.a. UBS FINANCIAL SERVICES, INC.<br>700 W.47th St., Suite 500<br>Kansas City, Missouri 64112<br>    SERVE:    CSC-Lawyers Inc.<br>              Service Co.<br>              221 Bolivar Street<br>              Jefferson City, MO 65101<br><br>and<br><br>JAMES "JAY" DEGOLER<br>    SERVE:    Jay Degoler<br>              UBS FINANCIAL SERVICES, INC.<br>              700 W.47th St., Suite 500<br>              Kansas City, Mo 64112<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. **0916-CV36471**<br>)<br>)          **12**<br>)<br>)  **DEMAND FOR JURY TRIAL**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

FILED-CIRCUIT COURT
JACKSON CO MO-KC
2009 NOV 16 PM 3:41

## PETITION FOR DAMAGES
(TJ)

COME NOW Plaintiff Carla C. Ingraham for her causes of action against Defendants UBS Financial Services, Inc. doing business as UBS Financial Services, Inc. and James "Jay" DeGoler, and alleges the following:

### PARTIES

1.   Plaintiff Carla C. Ingraham (hereinafter "Ingraham") is an individual currently residing in

Johnson County, Kansas, who at all relevant times was employed by UBS Financial Services, Inc. exclusively within Jackson County, Missouri.

2. Defendant UBS Financial Services, Inc. (hereinafter "UBS") is a New Jersey Corporation registered in Missouri; UBS operates a business on 700 West 47th Street, Suite 500, Kansas City, Missouri, 64112 where plaintiff was employed. UBS can be served by serving their registered agent, CSC-Lawyers Inc. Service Co. at 221 Bolivar Street, Jefferson City, Missouri 65101.

3. Defendant James "Jay" DeGoler (hereinafter "DeGoler"), upon information and belief, resides at 8421 Meadow Lane Leawood, Kansas, and was a stockbroker and/or First Vice President of Investments for UBS in Kansas City at the time of the unlawful employment practices alleged herein. DeGoler can be served at his place of employment at UBS FINANCIAL SERVICES, INC 700 W.47th St., Suite 500 Kansas City, Missouri 64112.

## MHRA AND ADMINISTRATIVE PROCEEDINGS

4. Plaintiff, at all times relevant hereto, constituted a "person" within the meaning of the Missouri Human Rights Act ("MHRA"), § 213.010, et seq., RSMo.

5. Defendants, at all times relevant hereto, constituted an "employer" within the meaning of the MHRA, § 213.010, et seq., RSMo. Degoler was plaintiff's boss, and was the major offender of plaintiff's rights under the MHRA.

6. UBS employs (and at all times relevant hereto has employed) far in excess of six (6) employees, so as to come within the coverage of the MHRA, § 213.010, et seq., RSMo. On or about December 29, 2008, Ingraham filed her initial Charges of Discrimination based on discrimination (sex), sexual harassment, and retaliation with the Missouri Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

2

Ingraham's Charges of Discrimination for sex discrimination, sexual harassment, and retaliation were assigned Missouri Charge Numbers E-12/08-34480 and 28E-2009-00463C. Ingraham filed amended Charges of Discrimination on June 19, 2009, and July 29, 2009 and August 18, 2009.

7. On or about September 22, 2009, the MCHR mailed to plaintiff her Notice of Right to Sue, which is attached as Exhibit A.

8. This action has been timely commenced by the filing of this Petition within ninety (90) days after plaintiff's receipt of the aforesaid Notice of Right to Sue. Therefore, plaintiff has duly met all administrative requirements of the MHRA.

## JURISDICTION AND VENUE

9. Both jurisdiction and venue are proper in this court. This Court has original subject matter jurisdiction over all of plaintiff's Missouri state causes of action. All unlawful employment practices and all other transactions and occurrences alleged herein were committed within Jackson County, Missouri.

10. This Court has jurisdiction over plaintiff's discrimination claims arising out of Missouri law, pursuant to § 213.010, et seq., specifically § 213.111, RSMo.

11. Plaintiff seeks damages in excess of this Court's jurisdictional minimum of $25,000.

## FACTUAL BACKGROUND OF PLAINTIFF'S CLAIM

12. Ingraham hereby incorporates all previous paragraphs, and those that follow, by reference, as if fully set forth in these factual allegations.

13. Ingraham began working for Kidder, Peabody (the predecessor to UBS) on or about December 16, 1986, as a sales assistant. Ingraham later earned the title of Senior Registered 'Client Service Associate' ("CSA"). Her duties included assisting her broker's clients,

3

servicing and growing her broker's business, processing equity and fixed income trade requests for retail and institutional clients, planning and preparing client review presentations, planning and preparing proposals for new business or portfolio restructuring, servicing internal operations and management clients, staying abreast of product and compliance knowledge, planning and organizing the firm's fund-raising and charitable programs and assisting in training other CSA's in addition to other administrative duties. Ingraham received high marks for her work during her many years at UBS.

14. After broker Richard Jensen retired in 2002, Ingraham began working for DeGoler in January, 2003. Jensen sold DeGoler his book of clients in exchange for DeGoler hiring Ingraham as his sales assistant. DeGoler immediately decreased Ingraham's compensation from 1.5% commission to 1.25% commission.

15. Thereafter, DeGoler began sexually harassing Ingraham. He referred to her as his "work wife," he talked about his waning sex life with his wife, and he told Ingraham his wife would "do handstands" if another woman paid attention to him, and that he had "better get laid" on a certain weekend. DeGoler repeatedly told Ingraham about his hairdresser's large breast size, repeatedly made inappropriate comments about Ingraham's breast size, made inappropriate comments to Ingraham about CSA Angela Lopez, referred to Ingraham's rubber fingertip as her "French Tickler," called Ingraham "Hoch" after the chauffeur in "Driving Miss Daisy," and repeatedly called Ingraham into his office to view sexually offensive e-mails on his computer.

16. DeGoler began to inappropriately hug Ingraham and told her to phone other CSA's into his office so he could hug them.

17. DeGoler repeatedly stood in front of Ingraham's desk and adjusted his pants zipper and repeatedly talked about the size of his genitals. He began standing very closely behind

4

Ingraham to see down her blouse. On one occasion, DeGoler announced to the office that Ingraham "would be giving massages in the nude" in his office.

18. On October 31, 2008, DeGoler repeatedly called Ingraham's home telephone after hours, and would not speak when Ingraham or her husband picked up the phone. DeGoler called and texted Ingraham frequently after business hours and on the weekends and when either of them was on vacation.

19. DeGoler openly stored alcohol in his office and drank after hours in his office. Managers noticed and even joined in the drinking. Deputy manager, Ed Carroll, commented on the office as "Party Cove," and asked to be invited. Market area manager, John Ellspermann witnessed the drinking in DeGoler's office. Ingraham was asked by employees, including DeGoler, to participate in the drinking.

20. DeGoler asked Ingraham what sexual positions she liked, and who in the office she "would sleep with." DeGoler asked if she would sleep with her former boss for a million dollars. He asked her about her sexual fantasies. He asked her if she gives "blow jobs," and if she "swallows" semen.

21. In October 2007, in DeGoler's office with the door shut, DeGoler looked on as Art Perry simulated pornographic movie sex acts in front of several witnesses, including Ingraham.

22. In January 2008, DeGoler told Ingraham he was going to rent a limousine for himself, Ingraham, broker Art Perry and other CSAs to "party in" before Christmas. Ingraham asked another CSA, Shelley James, why would DeGoler want to rent a limousine. James's response: "Whatever happens in the limousine, stays in the limousine." James also asked Ingraham if Ingraham ever got bored with her husband and wanted some excitement. James then asked, "Wouldn't you like to make out with DeGoler for 20 minutes?"

23. On or about September 22, 2008, DeGoler printed and placed on Ingraham's desk an article titled, "Fox Sexpert: The Vibrator, What's All the Buzz About?" This article described how a woman should bring herself to orgasm with a vibrator.

24. On or about September 24, 2008, DeGoler sat next to Ingraham's desk and asked Ingraham to give him a back massage. DeGoler also stared down Ingraham's sweater and made comments about Ingraham's breast size ("you have the biggest boobs"), repeatedly talked about the size of his genitals ("I have a tiny dick"), and said Ingraham's husband was "not invited" to a client's lake house — even though Ingraham was invited.

25. DeGoler told Ingraham at a UBS client appreciation dinner, "You need to go out to the parking lot and give (client name withheld) a blow job and swallow."

26. On or about October 1 and 2, 2008, DeGoler sent texts to Ingraham while he was on a UBS business trip in New York. He said his traveling companion was "getting laid," described the bra size and type of dress worn by a woman he met at the airport bar, and stated he was "going home" with that woman.

27. On or about December 11, 2008, DeGoler called Ingraham into his office. He verbally abused her by screaming at her behind his closed office door allowing her no escape. The tirade was triggered by Ingraham leaving at 3:00 p.m. for an appointment. DeGoler accused her of taking advantage of him. Ingraham feared for her physical safety.

28. On or about December 16, 2008, Ingraham reported DeGoler's behavior to Tara Krouse, Ingraham's line manager and the Branch Administrative Manager, and to Ed Carroll, Deputy Manager. They confirmed Ingraham followed proper procedures regarding attendance issues. They told Ingraham to talk with her brokers about the issues concerning DeGoler.

29. On or about December 19, 2008, DeGoler blamed Ingraham for "making him

6

blow up". When Ingraham objected, DeGoler abruptly removed her from his accounts, essentially firing her. DeGoler then threatened Ingraham so she would not report his harassment and retaliation.

30. Ingraham still worked for three (3) other brokers, and on or about January 2, 2009, Ingraham was assigned six (6) more brokers after a different CSA broke her ankle and had to miss work for months. Management had no discussion with Ingraham regarding additional compensation for her increased workload even though management was aware that Ingraham's compensation had been significantly reduced when DeGoler recently fired her. No other CSA had this big a workload. Krouse told Ingraham they would bring in temporary help to assist Ingraham, but never kept her promise. Instead, the temporary help that was hired by Krouse was assigned to assist another CSA and then to Krouse herself to do "special projects."

31. After Ingraham filed a formal complaint with UBS on or about 12/22/2008, UBS launched a supposed "investigation" into Ingraham's complaints, and unreasonably concluded that either Ingraham lied about DeGoler's behavior or invited DeGoler's behavior, such that his behavior was welcome. DeGoler did not come near Ingraham or her work area until after the investigation concluded around January 14, 2009. Then, DeGoler began frequently and inappropriately walking by and loitering near Ingraham's desk — even though it was not his normal route to his office — and glaring at her.

32. On or about February 2009, three brokers asked Ingraham if she would work for them since she no longer worked for DeGoler. They offered to pay her 1% commission. Ingraham agreed. The brokers asked manager Ed Carroll and line manager Tara Krouse for Ingraham to be assigned to them. Krouse said she would "get back to them." She never did.

33. On or about March 31, 2009, one of the brokers again asked Krouse for Ingraham

7

to be assigned to them. Krouse said she was too busy to reassign Ingraham at the moment and would do it later. She never did.

34. Although management acted on DeGoler's request to remove Ingraham immediately, management would not make a decision when other broker's requested Ingraham be reassigned to them, which would have helped make up for Ingraham's significant loss of income when DeGoler fired her from his accounts.

35. On or around April 8, 2009, Krouse summoned Ingraham into an empty office for a conference call with Debbie Wheeler, UBS Regional Administrative Officer in Chicago, IL. On the call, Wheeler said Ingraham needed to sign a "Letter of Education," because the company believed Ingraham consumed alcohol at work and participated in inappropriate emails and sexual banter after their investigation of Ingraham's complaints. Ingraham asked if anyone else received a letter like this but she received no response. Ingraham declined to sign the letter.

36. DeGoler stayed away from Ingraham for awhile after the "Letter of Education" incident, but his behavior changed again on or around April 23, 2009. He began inappropriately staring and glaring at Ingraham through other broker's doorways and windows. He walked in front of Ingraham's desk to get close to her and stare down at her. He stalked Ingraham and glared at her several times a day, sometimes only minutes apart. He had no business purpose for his behavior.

37. On or about April 20, 2009, Ingraham did not receive her paycheck for one pay period. She asked Tara Krouse twice how this happened and if it happened to any other employees. Ingraham received no response from Krouse

38. On or about April 21, 2009, Krouse assigned Ingraham to Broker Janet Groves, a very good friend of DeGoler. Ingraham was promised compensation for her work.

8

39. On or about April 23, 2009, Krouse asked Ingraham to move her desk so a new CSA could "see into the office of her Brokers." This was never a requirement for other CSA's. Ingraham did as she was ordered — even though she was now much closer to DeGoler's office. DeGoler began walking by her desk at an increasingly alarming rate. About that same time, Ingraham, who is the second most senior CSA, was assigned to work the switchboard and was given twice as much time on the switchboard as other less senior ranking CSA's. Her schedule was changed after she made a request for equal time.

40. At the end of April 2009, Ingraham became physically ill after being repeatedly stalked and glared at by DeGoler during the entire week. She had to start hiding from him. DeGoler increasingly found reasons to be near Ingraham. He stared at her through other broker's doorways and windows, sweeping by her desk and brushing up against it. He used another broker, Art Perry — who had completely avoided Ingraham and Ingraham's work area from January 2, 2009 until then — to also start appearing in Ingraham's work area to stare at her and loiter in her work area in an attempt to further intimidate and harass her.

41. After Ingraham's attorney requested that UBS put a stop to DeGoler's continued harassment of Ingraham, UBS placed Ingraham on administrative leave to investigate her claims of retaliation. The investigation "turned up nothing" according to UBS. UBS never advised Ingraham of the actual findings or results of the so-called investigation.

42. UBS declined to move Ingraham away from DeGoler, even after her attorney requested the move and even after they (UBS) had offered to do so.

43. On or about May 18, 2009, Ingraham returned from administrative leave. Krouse called Ingraham into meetings twice that day. In the first meeting, Krouse, with deputy manager, Ed Carroll present, told Ingraham that two (2) of her four (4) brokers were being reassigned to

9

DeGoler's assistant which resulted in another significant loss of compensation to Ingraham and that Ingraham would not be given any new brokers to replace them or the lost income. In the second meeting later that same day, Krouse along with Brokers John Spangler (DeGoler's college friend from the University of Kansas) and Janet Groves (another college friend of DeGoler's from the University of Kansas) refused to pay Ingraham after she returned because they were told "they should not pay her."

44. On or about May 19, 2009, Market area manager, John Ellspermann, issued a new "branch" policy restricting family members in the office. This was in direct reaction to Ingraham's husband visiting her the previous day when she returned from administrative leave to take her to lunch.

45. On or about May 21, 2009 Krouse and Ellspermann called in Ingraham to Krouse's office and questioned Ingraham about some beer found in the filing cabinets near an area where Ingraham had not worked for over five months and asked if it belonged to Ingraham. No one else was called in like this and asked about the beer.

46. On or about May 22, 2009, Broker Groves yelled at Ingraham in front of other employees, making false accusations about time away from her desk.

47. On or about May 28, 2009, Ingraham was again summoned to Krouse's office, with Theresa Leddy from UBS Human Resources in Weehawken, NJ, present via telephone, for interrogation about camera usage. They would not allow Ingraham to bring her camera to the office despite others being allowed do so.

48. On or about June 5, 2009, Ingraham was again summoned to Krouse's office. Also present was UBS Operations Manager, Erin Murphy. Ingraham was told she could not have her cell phone ringer on and was told not to text at work. There was no company policy

10

regarding cell phone ringers or texting. Other employees were allowed to keep their cell phone ringers on and could text from work.

49. On or about June 19, 2009, Ingraham was again summoned to Krouse's office. Also present was deputy manager, Ed Carroll and via telephone, Gaye Thurston, from UBS Human Resources in Weehawken, NJ. Ingraham was questioned if she had a camera pen. Then Krouse escorted Ingraham to Ingraham's desk and searched her desk in front of other employees. Then Krouse searched Ingraham's purse in full view of the office.

50. DeGoler, Ellspermann, Krouse and other UBS employees continuously created a hostile work environment, including inappropriate sexual conduct and discrimination, towards Ingraham which became worse and worse as time went on.

51. On July 1, 2009, UBS terminated Ingraham. This occurred one week <u>after</u> UBS acknowledged receipt of Ingraham's amended Charge of Discrimination which was filed on June 19, 2009.

## COUNT I

### SEX DISCRIMINATION
### (Violation under R.S.Mo. § 213.010 et seq. - Discrimination)

52. Plaintiff hereby incorporates all previous paragraphs of the Petition, by reference, as if fully set forth in this Count I.

53. The specific adverse employment actions described above and against plaintiff are based on Plaintiff's sex. Furthermore, all of the sexual discrimination and abusive conduct directed at plaintiff was either perpetrated by defendants, or condoned by defendants and ultimately ended with plaintiff's termination.

54. The actions of defendants, as noted above, have been continuously discriminatory,

arbitrary and capricious, and constituted a disparity in treatment toward plaintiff as to job terms, conditions, and privileges of employment, and constitute unlawful employment practices in violation of the MHRA.

55. The actions of defendants were outrageous, calculated toward plaintiff, or were in reckless disregard of plaintiff's statutory rights, and as such, constituted violations of the MHRA.

56. Plaintiff has been substantially financially damaged by defendants' unlawful employment practices, including its violation of the MHRA.

57. As a direct and proximate result of defendants' unlawful violation of plaintiffs rights, as alleged above, plaintiff has suffered substantial actual damages, including, but not limited to: lost past and future income and employee benefits, humiliation, mental distress, harm to reputation and severe career disruption, plus other pecuniary and non-pecuniary actual damages, all in an amount which cannot be ascertained precisely at this time, but which will be established in the course of discovery of comparative data regarding earnings and benefits paid to other employees who remained employed and performed plaintiffs duties after plaintiffs termination.

58. Plaintiff also is entitled to punitive damages in such amount as the jury deems fair, reasonable and sufficient to punish defendants and to deter these defendants and others from like conduct.

59. Under the MHRA, if plaintiff prevails, she is entitled to recover all her costs incurred herein, including reasonable attorneys fees and all other costs and expenses of litigation.

60. Plaintiff also seeks prejudgment interest on all actual damages found by the jury to be due and owing through date of trial.

WHEREFORE, plaintiff prays for judgment, after jury trial, awarding plaintiff all actual

damages and losses shown in evidence, and determined by the jury to be fair and reasonable, for prejudgment interest, for punitive damages, for attorneys fees and expenses, and for all other damages and costs incurred and for such other relief as the Court deems proper.

## COUNT II

### HOSTILE ENVIRONMENT AND SEXUAL HARASSMENT
### (Violation under R.S.Mo. § 213.010 et seq. - Harassment)

61. Plaintiff hereby incorporates all previous paragraphs of the Petition, by reference, as if fully set forth in this Count II.

62. Defendants' frequent and inappropriate sexual conduct/comments created an unwelcome, intimidating, hostile and offensive work environment and had the purpose/effect of unreasonably interfering with plaintiff's work performance.

63. The actions of defendants, as noted above, have been continuously harassing, arbitrary and capricious, and constituted a disparity in treatment toward plaintiff as to job terms, conditions, and privileges of employment, and constitute unlawful employment practices in violation of the MHRA.

64. The actions of defendants were outrageous, calculated toward plaintiff, or were in reckless disregard of plaintiff's statutory rights, and as such, constituted violations of the MHRA.

65. Plaintiff has been substantially financially damaged by defendants' unlawful employment practices, including its violation of the MHRA.

66. As a direct and proximate result of defendants' unlawful violation of plaintiffs rights, as alleged above, plaintiff has suffered substantial actual damages, including, but not limited to: lost past and future income and employee benefits, humiliation, mental distress, harm to reputation and severe career disruption, plus other pecuniary and non-pecuniary actual

damages, all in an amount which cannot be ascertained precisely at this time, but which will be established in the course of discovery of comparative data regarding earnings and benefits paid to other employees who remained employed and performed plaintiffs duties after plaintiffs termination.

67. Plaintiff also is entitled to punitive damages in such amount as the jury deems fair, reasonable and sufficient to punish defendants and to deter these defendants and others from like conduct.

68. Under the MHRA, if plaintiff prevails, she is entitled to recover all her costs incurred herein, including reasonable attorneys fees and all other costs and expenses of litigation.

69. Plaintiff also seeks prejudgment interest on all actual damages found by the jury to be due and owing through date of trial.

WHEREFORE, plaintiff prays for judgment, after jury trial, awarding plaintiff all actual damages and losses shown in evidence, and determined by the jury to be fair and reasonable, for prejudgment interest, for punitive damages, for attorneys fees and expenses, and for all other damages and costs incurred and for such other relief as the Court deems proper.

## COUNT III

### RETALIATION
### (Violation under R.S.Mo. § 213.010 et seq. - Retaliation)

70. Plaintiff hereby incorporates all previous paragraphs of the Petition, by reference, as if fully set forth in this Count III.

71. Plaintiff complained on multiple occasions to her employer of a hostile work environment, sexual harassment and sex discrimination as detailed above.

72. At the time plaintiff protested, opposed discriminatory treatment, and complained to management, plaintiff was performing all of her job duties satisfactorily.

73. After plaintiff protested to management about her opposition to the discrimination and sexual harassment, however, defendant retaliated against her for exercising her statutorily protected rights by continuing to harass plaintiff and ultimately terminating her.

74. The actions of defendants, as noted above, have been continuously discriminatory and retaliatory, arbitrary and capricious, and constituted a disparity in treatment toward plaintiff as to job terms, conditions, and privileges of employment, and constitute unlawful employment practices in violation of the MHRA.

75. Plaintiff's complaints about and objection to the discrimination and harassment were a contributing factor in defendant's decision to terminate plaintiff. Defendants therefore violated MHRA.

76. The actions of defendants were outrageous, calculated toward plaintiff, or were in reckless disregard of plaintiff's statutory rights, and as such, constituted violations of the MHRA.

77. Plaintiff has been substantially financially damaged by defendants' unlawful employment practices, including its violation of the MHRA.

78. As a direct and proximate result of defendants' unlawful violation of plaintiffs rights, as alleged above, plaintiff has suffered substantial actual damages, including, but not limited to: lost past and future income and employee benefits, humiliation, mental distress, harm to reputation and severe career disruption, plus other pecuniary and non-pecuniary actual damages, all in an amount which cannot be ascertained precisely at this time, but which will be established in the course of discovery of comparative data regarding earnings and benefits paid to other employees who remained employed and performed plaintiff's duties after plaintiff's

termination.

79.   Plaintiff also is entitled to punitive damages in such amount as the jury deems fair, reasonable and sufficient to punish defendants and to deter these defendants and others from like conduct.

80.   Under the MHRA, if plaintiff prevails, she is entitled to recover all her costs incurred herein, including reasonable attorneys fees and all other costs and expenses of litigation.

81.   Plaintiff also seeks prejudgment interest on all actual damages found by the jury to be due and owing through date of trial.

WHEREFORE, plaintiff prays for judgment, after jury trial, awarding plaintiff all actual damages and losses shown in evidence, and determined by the jury to be fair and reasonable, for prejudgment interest, for punitive damages, for attorneys fees and expenses, and for all other damages and costs incurred and for such other relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues.

Respectfully submitted,

THE POPHAM LAW FIRM, PC

By: /s/ Dennis E. Egan
Dennis E. Egan - MO #27449
712 Broadway, Suite 100
Kansas City, Missouri 64105
Telephone:   816/221-2288
Facsimile:   816/221-3999
E-Mail:   degan@pophamlaw.com

ATTORNEY FOR PLAINTIFF